CLOSED

ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD WEBSTER,

Plaintiff,

vs

Case No: 01-74983
Honorable Victoria A. Roberts

UNITED AUTO WORKERS, LOCAL 51
INTERNATIONAL UNITED AUTO WORKERS,
ARTHUR BIANCHI, NATHANIEL MARTIN,
GIL WOJCIK, ROSALYN GRANT,
HOLLY WAINGROW, OLLIE WILLIAMS,
ROBERT LEE MITCHELL, JAMES MOORE,
STEPHEN YOKICH, MAURICE MITCHELL,
STAN GEIS, PETE CUTWAY, NATE GOODEN,
and EUNICE STOKES, jointly and severally,

Defendants.
_______________________________________/

FILED

NOV 04 2003

CLERK'S OFFICE
U. S. DISTRICT COURT
EASTERN MICHIGAN

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This matter comes before the Court on Defendants' Motions for Summary Judgment [Docs. 34 and 35]. Plaintiff brought this action against Defendants alleging: (1) violation of the Labor Management Reporting and Disclosure Act; (2) retaliation under the Elliott-Larsen Civil Rights Act; (3) injurious falsehood; (4) intentional infliction of emotional distress; and (5) continuing acts of defamation/retaliation.

For the reasons stated below, the Court GRANTS Defendants' Motions in their entirety.

## II. BACKGROUND



50

Plaintiff Richard Webster ("Plaintiff") brought suit against United Auto Workers, Local 51 ("Local 51") and against the following individual members of Local 51: Arthur Bianchi ("Bianchi"), Nathaniel Martin ("Martin"), Rosalyn Grant ("Grant"), Holly Waingrow ("Waingrow"), Ollie Williams ("Williams"), Robert Lee Mitchell ("Mitchell") and James Moore ("Moore") (collectively "Local 51 Defendants"). Plaintiff also named International United Auto Workers ("International Union") as a defendant as well as the following members of International Union: Stephen Yokich ("Yokich"), Maurice Mitchell ("Maurice Mitchell"), Stan Geis ("Geis"), Pete Cutway ("Cutway"), Gil Wojcik ("Wojcik"), Nate Gooden ("Gooden") and Eunice Stokes ("Stokes") (collectively "International Union Defendants"). (Collectively, Local 51, International Union and all individuals will be known as "Defendants").

Plaintiff began working for Chrysler Corporation ("Chrysler") in 1964. Pl. Depo. at 19-20.[1] He held full-time elected union positions since 1974, *id.* at 16-17, 19, where he represented plant employees and performed contract administration duties. *Id.* at 27-28. Even though he was a full-time elected Local 51 official, Plaintiff was employed and paid by Chrysler, *id.* at 618-19. He accrued seniority as a "job setter." *Id.* at 13-14.

In 1997, during bargaining for the Local 51 Settlement Agreement with Chrysler, Plaintiff allegedly learned that Local 51 and management silently agreed to end propshaft production at the Mound Road Engine Plant. Plaintiff, however, refused to signed the 1997 Settlement Agreement because to do so would have meant that several hundred jobs would be lost at the plant. Various media interviewed Plaintiff, asking him why he walked

---

[1]Plaintiff took thirteen days of deposition testimony. None of the parties included his deposition testimony in its entirety in motion papers. Accordingly, this Opinion and Order relies on the citations used by the parties when citing to Plaintiff's deposition.

out of the negotiations. Plaintiff responded that he had been "sold out" by members of Local 51.[2] Pl. Br. at 8. A twenty-eight day strike ensued. As a result, Chrysler and International Union officials began publicly accusing one another of falsehoods. *Id.* Since then, Plaintiff alleges that he has been the subject of reprisals.

In March 1998, Plaintiff wrote a letter to International Union regarding alleged misuse of Local 51 funds. In October 1998, then-Local 51 President Sam Narduccio was removed for misappropriation of union funds. *Id.* at 9.

On May 12, 1998, Local 51 held elections for the committee person and chief steward positions at the Mound Road Engine Plant. Plaintiff ran and won reelection as the Machining Division Committeeman. Darryl Mitchell (not a party to this case) protested the results of the election due to alleged misconduct by Plaintiff's challenger and filed an election appeal asking International Union to order a re-run election.

Stokes, Administrative Assistant to International Union President Yokich, was assigned to investigate the election appeal. She held a finding of fact hearing on October 1, 1998. Her investigation revealed that problems surrounded the election. In light of Stokes' findings, International Union's Executive Board ("IEB") overturned the election and ordered a re-run election. The re-run election was held on May 6, 1999 and Plaintiff defeated Darryl Mitchell for Machining Division Committeeman. Pl. Depo. at 15.

In November 1998, Plaintiff noticed in a Local 51 financial report that William M. Kirksey ("Kirksey"), a Local 51 member not a party to this case, had received a disciplinary

---

[2]In the argument section of his brief, Plaintiff states that he walked out of the 1999 Settlement Agreement negotiations and, at that time, informed the media that he had been "sold out." At 27.

layoff. Pl. Exh. 51. Plaintiff maintains that Kirksey then applied for and received lost time pay from June 22, 1998 through June 27, 1998. Pl. Br. at 20. Local 51 membership moved for an investigation of the alleged financial impropriety. Plaintiff, however, did not personally levy any charges against Kirksey, Pl. Br. at 20-21, though he maintains that Kirksey did in fact receive lost time pay in violation of Local 51 bylaws as well as the UAW Constitution. Pl. Exh. 52.

Geis, the Administrative Assistant to Secretary-Treasurer Ruben Banks, testified in his deposition that he met with Kirksey between January 11, 1999 and March 10, 1999 to investigate the allegation of financial impropriety. Pl. Exh. 54. Plaintiff alleges that neither Geis nor Gooden, who apparently assisted in the investigation, was authorized to conduct the financial investigation under Art. 48, § 3 of the UAW Constitution. Nevertheless, Geis concluded in a letter that, after having reviewed the vouchers and payroll stubs, Kirksey had committed no impropriety.

In May 1999, Local 51 Defendants were elected to the following positions: Bianchi, President; Martin, Vice President; Grant, Recording Secretary; Waingrow, Financial Secretary; Williams, Treasurer. Bianchi Depo. at 9-10, 52-53. Also, Local 51 Defendants Mitchell and Moore were elected, along with Plaintiff, to the shop committee in May 1998 and again in the May 1999 re-run election. Pl. Depo. at 43-44. As for International Union Defendants, Yokich served as President of the International Union from June 1995 to June 2002. Stokes, as previously stated, served as Administrative Assistant to Yokich. Gooden, during relevant times of this lawsuit, was the Regional Director for UAW Region 1. Geis, also previously mentioned, served as Administrative Assistant to Secretary-Treasurer Ruben Burks. Cutway, Wojcik and Maurice Mitchell served as International

representatives assigned to the UAW DaimlerChrysler Department.

In 1999, Local 51 Defendants and Plaintiff sat on the Local 51 bargaining committee. Bianchi Depo. at 53. Around August 1999, the committee and Chrysler began negotiations for the Local Collective Bargaining Agreement.

On October 21, 1999, a Settlement Agreement was reached. Local 51 Exh. 2. The 1999 Settlement Agreement stated that "... [t]he Union will recommend to the membership that it be ratified." *Id.* (ellipse and brackets added). Defendants state that Plaintiff signed the 1999 Settlement Agreement. Pl. Depo. at 345-46, 503, 506-07. However, Plaintiff disputes this contention.

Mitchell wrote and distributed two letters to Local 51 members urging them to ignore opposition to ratification of the 1999 Settlement Agreement. Local 51 Exhs. 5 and 6; Pl. Depo. at 553-63. Plaintiff maintains that Mitchell's letters did not mention or urge ratification of the Settlement Agreement. Mitchell's letters, dated October 24, 1999, however, expressly provided that "[s]ome of your union reps **and those** who are blind loyalists have received the following **marching orders:** ... Go out there and disrupt, excite, and whip the rank and file up over any and every issue so that we can prevent the **Mound Road Engine contract from being ratified.**" Pl. Exh. 6, October 24, 1999 Mitchell Letter (emphasis in original; brackets and ellipse added).

Local 51 membership, however, did not ratify the 1999 Settlement Agreement. Local Exh. 7; Pl. Depo. at 567. Local 51 members circulated a petition seeking a second ratification vote. *Id.* at 649. A second vote was scheduled for November 4, 1999. Local 51 Exh. 8.

The bargaining committee responded to Plaintiff's efforts by writing and distributing literature seeking support for the 1999 Settlement Agreement while being critical of Plaintiff. Specifically, a series of documents entitled "A Candid Conversation With Sir Richard of Webster" was disseminated. The "conversations" were written in a question-and-answer format in an effort to create a satirical conversation with Plaintiff. The bargaining committee also distributed "Are You Interested in the Truth," Local Exh. 21, "Let's Talk About the Truth," *id.* at Exh. 22, and "So Richard You Want An Apology." *Id.* at Exh. 23. Plaintiff claims that these "conversations" were not written to garner support for the Settlement Agreement, but rather to look like actual "conversations" with him. Pl. Br. at 11 (citing Pl. Exh. 9, Moore Depo., at 20-21). Plaintiff alleges that the "truth" documents imply that he is a liar. Additionally, Plaintiff maintains that the "So Richard You Want An Apology" document apologized to Local 51 members for not taking him out sooner. Pl. Br. at 12. On October 10, 1999, Plaintiff alleges that Mitchell referred to him as the "Maggot of Mayhem."[3] Pl. Exh. 15, "I Didn't Sleep At All Last Night." Moreover, Plaintiff observed cartoon caricatures of himself at the Mound Road Engine Plant. Pl. Exh. 1.

On November 4, 1999, the Settlement Agreement was ratified by Local 51. Local 51 Exh. 24. Thereafter, Plaintiff filed several internal union charges against the local defendants related to the allegations made in this action, Pl. Depo. at 122, 166, 689-90, namely the "Conversations," "Truth" and "Apology" pieces noted above. Pl. 2d Amend. Cmplt. ¶¶ 36-37. Plaintiff's November 8, 1999 charge alleged a violation of the UAW

---

[3]In his opposition brief, Plaintiff alleges that Mitchell referred to him "either as the 'demon or the maggot of mayhem.'" At 13.

Ethical Procedures Code by Bianchi, then-President of Local 51. Plaintiff later learned, "through rumor," Pl. Br. at 13, that the Local 51 Executive Board had denied Plaintiff's charges. Plaintiff, however, admits that he did not exhaust internal union appeals. Pl. 2d Amend. Cmplt. ¶¶ 52-55, 68-71, 89-92, 99-102, 129-30.

Plaintiff appealed the Local 51 Executive Board decision to the IEB on November 30, 1999. He never received a hard copy of the Local 51 Executive Board decision. In her deposition, Stokes testified that she had not been notified of Local 51's Executive Board ruling. Pl. Exh. 12.

On December 2, 1999, Plaintiff filed a charge against all Local 51 Defendants alleging a violation of the UAW Ethcial Practices Code. Local 51 Executive Board decided that Plaintiff's charge was improper and without merit when it released its January 2000 general membership minutes. Pl. Exh. 18, Local 51 Executive Board Meeting Minutes, January 6, 2000. Plaintiff maintains that he was never made aware of Local 51 Executive Board's decision until he filed the present action. Pl. Exh. 2, Pl. Aff., at ¶ 11. Moreover, Plaintiff alleges that Local 51 Defendants were not authorized to hear Plaintiff's December 2, 1999 charge. Pl. Br. at 13-14.

On December 9, 1999, Plaintiff filed an appeal with Bianchi, pursuant to Local 51's bylaws asking Bianchi to intervene because Mitchell was "preventing [Plaintiff] from meeting as a member of the shop committee to represent constituents in 2nd step grievance procedures." Pl. Br. at 14 (brackets added). Plaintiff alleges that Mitchell told management not to meet with Plaintiff on any such procedures unless Mitchell himself called the meeting. *Id.* Plaintiff asserts that "[m]anagement indicated in writing that it had been instructed by ... Mitchell not to meet with [Plaintiff]." Id. at 14-15 (brackets and ellipse

added).

When Bianchi did not respond to Plaintiff's December 9, 1999 appeal, Plaintiff appealed to Local 51's Executive Board on December 10, 1999. This appeal raised three issues: (1) cancellation of the December 199 Local 51 meeting by Bianchi; (2) failure of Local 51's Executive Board to notify Plaintiff of its decision on Plaintiff's November 8, 1999 charge; and (3) intervention of Local 51 Executive Board in Mitchell's prohibition of Plaintiff's meetings with management on second step grievances. Pl. Br. at 15.

Meanwhile, in December 1999, Plaintiff "was experiencing profound anxiety and depression" as a result of the circumstances at Chrysler. Pl. Exh. 19, Letter from Joel L. Young, M.D. Plaintiff's doctor advised him to take sick leave, but he refused. During that same time period, Plaintiff began to abuse alcohol. By December 15, 1999, Plaintiff was not able work. His doctor prescribed medication and again told Plaintiff to take sick leave. He also prescribed a therapy program.

On December 31, 1999, Plaintiff retired from Chrysler. *Id.* at 8-9. Under paragraph 17, page 21 of the 1999 National Collective Bargaining Agreement between the National Union, UAW and DaimlerChrysler, Plaintiff was required to relinquish his union position.[4] Local 51 Exh. 1.

In January 2000, Local 51's Executive Board met and treated Plaintiff's December 10, 1999 appeal as a charge under Art. 31 of the UAW Constitution and not under the Local 51 bylaws as Plaintiff had intended.

---

[4]Specifically, the National CBA provides the following: "The Plant Shop Committee of the Union Shall consist of not more than six (6) members, each of whom shall be an employee of the plant having seniority ...."

Also in January 2000, Bianchi requested authority from Yokich to appoint a new bylaws committee for Local 51. Pl. Exh. 18, Local 51 Executive Board Meeting Minutes, January 6, 2000. Plaintiff maintains that this request was improper, Pl. Br. at 16, and that he was not informed of the dissolution of the bylaws committee until discovery in this lawsuit. *Id.* On September 18, 2002, Plaintiff filed an appeal to Local 51 on the dissolution of the bylaws committee and his removal as chairman with Local 51 Defendant Grant. In October 2002, Grant, allegedly refused to bring Plaintiff's appeal before the Local 51 Executive Board.

Plaintiff presented his appeals to the membership of Local 51 which granted them. Martin, however, appealed Local 51's decision. Pl. Exh. 29, Martin Appeal. Stokes replied in a letter to Local 51 President, John Williams, instructing him to notify Plaintiff that his appeals were set aside as improper, and to notify him of his right to appeal to Yokich. Pl. Exh. 30, Letter to John Williams.

In October 2002, Plaintiff filed conduct unbecoming a union official charges against Grant for her alleged failure to present his appeal to Local 51's Executive Board. Pl. Exh. 35. Plaintiff was informed by Local President John Williams that his appeal was untimely. Pl. Exh. 37. Plaintiff then appealed to the International Union. Pl. Exh. 38. Plaintiff's appeal was dismissed by letter from Stokes. Pl. Exh. 39. On March 14, 2003, Plaintiff requested that Stokes clarify the response to his appeals. Pl. Exh. 40. To date, Plaintiff has not received clarification.

Plaintiff alleges that all of these events resulted in poor health and his premature retirement on December 31, 1999. Pl. Br. at 22; Pl. Exh. 2, Pl. Aff., ¶ 12.

## III. STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (brackets added). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox*, 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. Rule 56(e); *Cox*, 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland*, 57 F.3d at 479. The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV. ANALYSIS

### *A. Retaliation Claim Under the Labor Management Reporting and Disclosure Act*

Defendants argue that because there is no evidence that either Local 51 or International Union took collective action against Plaintiff in 'forcing him out' of the union, Plaintiff's claim under the LMDRA must fail.

The Labor Management Reporting and Disclosure Act ("LMRDA") provides the following:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organizations' established and reasonable rules pertaining to the conduct of meetings: *Provided*, that nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2). Section 411(a)(5) makes "it unlawful for a union to "fine[e], suspen[d], expe[l], or otherwise discipline" any of its members for exercising rights secured

under the LMDRA." *Breininger v. Sheet Metal Workers Intl. Assn. Local Union No. 6*, 493 U.S. 67, 90 (1989) (brackets in original).

The Supreme Court has concluded "that by using the phrase 'otherwise disciplined,' Congress did not intend to include all acts that deterred the exercise of rights protected under the LMDRA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules." *Id.* at 91; *see also United Food and Commercial Workers v. United Food and Commercial Workers Intl. Union*, 301 F.3d 468, 473 (6th Cir. 2002). Thus, a union member is "disciplined" when the union takes action "'under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership.'" *Id.* (quoting *Miller v. Holden*, 535 F.2d 912, 915 (5th Cir. 1976)).

In this case, Plaintiff conceded that he was "not officially discharged or suspended ...." Pl. 2d Amend. Compl. ¶ 50. However, he alleges that he "was constructively discharged (i.e., forced out of the union)[,]" *id.* (brackets added), and was, therefore, "disciplined" for purposes of the LMRDA because he "made statements and filed charges against certain union officials for financial impropriety and other alleged misconduct." *Id.* at ¶¶ 47, 50-51.

As an initial–but perhaps dispositive–matter, Plaintiff has presented no evidence that he was forced out of Local 51. In fact, in his Second Amended Complaint, filed on May 21, 2003, Plaintiff stated that "[a]t all relevant times, Plaintiff has been a dues-paying *member in good standing of Defendant UAW51*." At ¶ 105 (emphasis added). Moreover, Plaintiff alleges that he was defamed and/or retaliated against up to and including in 2003.

It is difficult, if not impossible, for the Court to discern how Plaintiff can be both a Local 51 member in good standing up to and including in 2003, while simultaneously being "forced out of the union."

Even assuming that Plaintiff was forced out of Local 51, he has failed to present any evidence that he "received punishment by the union as a collective entity to enforce its rules." *Breininger*, 493 U.S. at 91.

Plaintiff argues that after he filed grievances for Kirksey's alleged impropriety, he became the target of retaliation. He contends that he was subject to verbal and written abuse by Local 51 Defendants. Additionally, he claims that "disdain and disparagement" followed after he walked out of negotiations and told the media that he had been "sold out" by Local 51 in either 1997, Pl. Br. at 7, or 1999. *Id.* at 27. Plaintiff further asserts that he lost his teaching position at Wayne State University because Gooden had influenced Plaintiff's unnamed supervisor at the university. He claims further that he was forced to re-run for his position as committeeman (which he won anyway). These acts, Plaintiff maintains, constitute "discipline" in retaliation for exercising his free speech rights under the LMRDA.

Plaintiff maintains that the cartoon caricatures and the negative documents published about him evidence a violation of the LMRDA because it constituted retaliation for Plaintiff's exercise of free speech rights. Such a claim, then, would ignore the fact that Local 51 Defendants are union members also and, therefore, entitled to the same free speech protection as Plaintiff under 29 U.S.C. § 411(a)(2). Furthermore, the Supreme Court's construction of the "otherwise disciplined" language of the LMRDA was rooted in part on "the specifically enumerated types of discipline–fine, expulsion, and

suspension–[which] imply some sort of established disciplinary process rather than ad hoc retaliation by individual union officers." *Breininger*, 493 U.S. at 91-92 (and treatise cited) (brackets added). In short, the exercise of free speech rights by union members other than Plaintiff do not constitute "discipline" for purposes of the LMRDA. Rather, such written and verbal rebukes constitute ad hoc retaliation which is not actionable. *See id.*

Moreover, Plaintiff has not brought forth any evidence which would tend to show that Gooden's conversation with Plaintiff's supervisor at Wayne State evidences that Plaintiff was "disciplined" by either Local 51 or International Union as a "collective entity." *Id.* at 91. Such an action, assuming it took place and that it was done in retaliation of Plaintiff's exercise of his free speech rights, constitutes non-actionable, ad hoc conduct. *See id.* at 91-92.

Plaintiff also attacks the thoroughness of the investigation of Kirksey and the appropriateness of the re-run election in October 1999, but fails to show that these matters resulted in "discipline" by Defendants.

In support of his argument that his charges and/or appeals were "aborted" by Defendants, Plaintiff relies on *Kinslow v. American Postal Workers Union, Chicago Local*, 222 F.3d 269 (7th Cir. 2000).

In *Kinslow*, the plaintiff union member sought access to the union's financial records after the union president and secretary/treasurer were indicted for making illegal loans, destroying financial records, mail and wire fraud, tax evasion and theft and embezzlement of union funds. *Id.* at 272. The plaintiff was denied access to the records and union leaders became "fed up" with him and "began to retaliate against him." *Id.*

Plaintiff's reliance on *Kinslow* is misplaced for the following reasons: First, there is no evidence that Local 51 Defendants or International Union Defendants have been indicted for any criminal activity. Second, there is no evidence that Plaintiff was denied access to any financial records related to Kirksey or others.[5] Third, there is no evidence that Plaintiff was denied overtime work or that union stewards refused to file grievances on his behalf, as was the case in *Kinslow*. Fourth, Plaintiff's contention that the facts in *Kinslow* are similar to the case at bar must fail because the only evidence in this case that Plaintiff's appeals were futile is based on Plaintiff's claim that his charges were against those who sat on the Local 51 Executive Board and the IEB. This claim, by itself, is insufficient to show the same futility as the plaintiff in *Kinslow*. The plaintiff in *Kinslow* believed his appeals were futile because the president of the union was indicted on several criminal accounts upon which the plaintiff based his charges, because the president presided over the Plaintiff's charges while criminal charges against him were pending and because the Plaintiff feared for his life. No such facts are present here. Moreover, there is no evidence that Plaintiff feared physical harm as the Plaintiff in *Kinslow* did.

But even if all these factors were similar to those in *Kinslow*, the Court finds that *Kinslow* does not apply because *the plaintiff in that case was actually expelled from the union*. The Seventh Circuit expressly stated that the union "board charged Kinslow with

---

[5]In its brief, Local 51notes that Plaintiff requested the 1998 and 1999 lost time vouchers for Local 51 Defendants. Local 51 admits that it rejected the request and instead provided Plaintiff with computer printouts showing lost time payments. Local 51 Exh. 29, Req. No. 3. Local 51 points out that Plaintiff did not file a motion to compel production of such vouchers, but the Court does not need to consider whether or not it should have because Plaintiff fails to bring forth evidence that such a depravation constituted "discipline" for purposes of the LMRDA.

engaging 'in conduct that would expose the [u]nion to civil liability,' meaning his filing of this suit. *Ironically, it is this charge that set in motion the events which would contribute to the [u]nion's civil liability in this case.* Although the accusation was out of line, ... the [u]nion members voted unanimously to expel Kinslow." 222 F.3d at 272-73 (brackets, emphasis and ellipse added). Here, on the other hand, Plaintiff was admittedly "not officially discharged or suspended," but rather, "disciplined" by being "forced out of the union." Pl. 2d Amend. Compl. at ¶ 50. If Plaintiff was forced out of Local 51, he has, nevertheless, failed to show evidence that he was "disciplined" for exercising his rights under the LMRDA.

Accordingly, Plaintiff's LMRDA claim fails because he has failed to show (1) that he was forced out of Local 51–which is the basis for his LMRDA claim; and (2) that he was "disciplined" at all, let alone in retaliation for his exercise of free speech rights. Defendants are entitled to summary judgment on Plaintiff's LMRDA claim.

***B. Retaliation Claim Under the Elliot-Larsen Civil Rights Act***

Defendants contend that because they did not take any action against Plaintiff due to religion, race, color, national origin, age, sex, height, weight or marital status, that his ELCRA retaliation claim must fail as a matter of law. Defendants further argue that even if Plaintiff claims that he was retaliated against on account of his religion, there is no evidence that Defendants knew of his religion or that he was retaliated against due to his religion.

The Elliott-Larsen Civil Rights Act ("ELCRA") prohibits two or more persons from retaliating or discriminating "against a person because the person has opposed a violation

of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this aid." Mich. Comp. Laws § 37.2701(a). The ELCRA also states that a union shall not "[e]xclude or expel from membership, or otherwise discriminate against a member or applicant for membership because of religion, race, color, national origin, age, sex, weight, or marital status." Mich. Comp. Laws § 37.2204(a) (brackets added).

In order to establish a prima facie case of retaliation under the ELCRA, a plaintiff must show the following:

> (1) that he opposed violations of the [ELCRA] or participated in activities protected by the [ELCRA], (2) that the company was aware of his participation, (3) that the company subsequently took action adverse to plaintiff, and (4) that the opposition or participation was a significant factor in the adverse employment decision.

*Minnis v. McDonnell Douglas Tech. Serv. Co.*, 162 F. Supp. 2d 718, 738 (E.D. Mich. 2001) (citing *Booker v. Brown and Williamson*, 879 F.2d 1304, 1310 (6th Cir. 1989)) (emphasis withdrawn; brackets added). "In order to engage in a 'protected activity', a plaintiff must actually oppose activity that, if true, would be a violation of the civil rights laws." *Comiskey v. Automotive Industry Action Group*, 40 F. Supp. 2d 877, 898 (E.D. Mich. 1999) (citing *Booker*, 879 F.2d at 1313).

Plaintiff alleged that he "engaged in the protected activity of filing formal charges with [Local 51] regarding the alleged financial impropriety and misconduct by certain union officials." Pl. 2d Amend. Compl. at ¶ 59 (brackets added). Plaintiff further alleged that there is a causal connection between these charges and inaction on the part of Defendants to investigate the charges which resulted in his constructive discharge. *Id.* at ¶ 62. As

stated above, however, "[i]n order to engage in a 'protected activity', a plaintiff must actually oppose activity that, if true, would be a violation of the civil rights laws." *Comiskey*, 40 F. Supp. 2d at 898 (citing *Booker*, 879 F.2d at 1313) (brackets added). Plaintiff has not alleged that he was retaliated against because of his religion, race, color, national origin, age, sex, height, weight, or marital status; rather, he has alleged that he was retaliated against because he filed charges of alleged financial impropriety and union official misconduct.

Plaintiff points to no authority whereby an allegation of financial impropriety and/or union official misconduct constitutes a violation of civil rights laws. Thus, Plaintiff has failed to show that he either opposed violations of the ELCRA or that he participated in activities protected by the ELCRA. Such a failure means that Plaintiff cannot establish the first element of a prima facie case for ELCRA retaliation. Accordingly, Defendants are entitled to summary judgment on Plaintiff's ELCRA retaliation claim.[6]

### *C. Claim for Injurious Falsehood*

Defendants further maintain that Plaintiff's claim for injurious falsehood must fail because (1) Plaintiff did not plead the claim with specificity; (2) that their speech was privileged; (3) that there is no evidence that Defendant's speech was false; (4) there was no evidence that Defendants either knew or should have known that their speech would cause Plaintiff pecuniary harm; and (5) Plaintiff failed to plead special damages.

---

[6]In their respective briefs, both Local 51 and International Union argue that Plaintiff has admitted that he was not discriminated against on the basis of his religion. Local 51 Br. at 12-13; International Union Br. at 7. However, it is not necessary for the Court to even consider this argument because Plaintiff states in his opposition brief that his ELCRA claim is a *retaliation* claim and not a discrimination claim. Pl. Br. at 3.

Recovery for injurious falsehood is appropriate where there has been "some interference with an economically advantageous relationship which results in pecuniary loss ...." *Kollenberg v. Ramirez*, 127 Mich. App. 345, 350-81 (1983) (ellipse added). In order to establish a prima facie case for injurious falsehood, the plaintiff must show the following:

> (1) that the defendant published a false statement to a third party knowing that statement to be false (or acting in reckless disregard for its truth or falsity); (2) that the defendant knew, or should have known, that this false publication would likely result in pecuniary loss or in harm to interest of the plaintiff having a pecuniary value; and (3) that the plaintiff suffered special damages as a result.

*Neshewat v. Salem*, 173 F.3d 357, 364 (6th Cir. 1999) (citing *Knollenberg*, 127 Mich. App. at 352; Restatement (Second) of Torts, § 623A (1977)).

Defendants correctly state the elements to injurious falsehood, but, in their analysis, consider two additional elements (both of which are elements in the prima facie case for defamation). Plaintiff, on the other hand, does not help his own argument: In the argument section of his brief, he cites the prima facie case for defamation while neglecting to mention, discuss or analyze the law of injurious falsehood as applied to the facts of this case. Perhaps the parties are referring to Plaintiff's original Complaint where Plaintiff alleged defamation under both federal, 29 U.S.C. §§ 157-158, and Michigan law, Mich. Comp. Laws § 600.2911. Plaintiff's original Complaint, however, was superceded by his Second Amended Complaint which did not include any defamation claims.

The Court, thus, will consider, only the three elements to a claim of injurious falsehood, and will do so in inverse order.

**1. <u>Plaintiff Failed to Specifically Plead Special Damages</u>**

Plaintiff must establish that he suffered special damages as a result of statements published by Defendants. Both the Federal Rules of Civil Procedure and the Michigan Court Rules require that "[w]hen items of special damages are claimed, they shall be specifically stated." Fed. R. Civ. P. 9(g); M.C.R. 2.112(I) (brackets added).

In his Second Amended Complaint, Plaintiff alleged that he "has suffered special damages as a result of Defendants' actions." At ¶ 88. In his response to Defendants Motions for Summary Judgment, however, Plaintiff stated the following:

> As to Defendants' statements, "Plaintiff complains that the International Union Defendants published negative information about him that was false" and "In Michigan defamation related claims must be pleaded with specificity", *Plaintiff admits*. As to Defendants' statements, "In his Complaint, Plaintiff failed to identify the exact statements and documents about which he is complaining; he failed to identify who uttered the statements or wrote the documents about which he is complaining; he failed to identify when and where the alleged statements and documents were published; and he failed to identify the defamatory nature of the statements and documents about which h[e] is complaining", *Plaintiff admits and further avers that Plaintiff only discovered the statements and documents during discovery.* As to Defendants' statement, "Therefore, Count III of the Complaint should be dismissed", *Plaintiff denies for reason same is untrue.*

Pl. Br. at 4 (emphasis in original; brackets added).

While Plaintiff pled special damages in his Second Amended Complaint, he failed to do so, by his own admission, with specificity.[7] As a matter of law, Plaintiff has failed to establish the third element of the prima facie case. It is unnecessary, then, for the Court

---

[7]In the argument section of his opposition brief, Plaintiff argues that ¶¶ 73-93, but specifically ¶ 77, of his Second Amended Complaint sufficiently pled his injurious falsehood claim with specificity. Pl. Br. at 30. This statement, of course, is wholly contrary to his 'admission' on page 4 of his brief. In light of Plaintiff's 'admission' and given the fact that his specificity argument rests entirely on his Second Amended Complaint, Plaintiff has failed to create a genuine factual issue on this element. Thus, his injurious falsehood claim cannot be sustained.

to consider the first and second elements of the claim. Defendants are entitled to summary judgment on Plaintiff's injurious falsehood claim.

### *D. Claim for Intentional Infliction of Emotional Distress*

Defendants argue that Plaintiff has failed to state a claim for intentional infliction of emotional distress because their conduct did not rise to the level of "extreme" or "outrageous."

In order to establish a prima facie case for intentional infliction of emotional distress ("IIED"), the Plaintiff must show (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Graham v. Ford*, 237 Mich. App. 670, 674 (1999) (citing *Haverbush v. Powelson*, 217 Mich. App. 228 (1996)).

#### 1. Defendants' Conduct Was Neither Extreme Nor Outrageous

Liability for IIED can be found only where the conduct of which plaintiff complains is "extreme" and "outrageous." Michigan courts have determined that conduct is *not* "extreme" and "outrageous" where

> the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice', or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible grounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community .... The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

*Chisolm v. Michigan AFSCME Council 25*, 218 F. Supp. 2d 855, 875 (E.D. Mich. 2002) (quoting *Margita v. Diamond Mortgage Corp.*, 159 Mich. App. 181, 188 (1987)) (internal quotations and ellipse in original).

Plaintiff principally relies on *Haverbush v. Powelson*, 217 Mich. App. 228 (1996),[8] for the proposition that the facts stated in this case evidence "extreme" and "outrageous" behavior and as such, Defendants are precluded from summary judgment. "The trial court initially makes the determination whether conduct is so extreme as to permit a cause of action for IIED; however, where reasonable minds could differ, the jury is to decide the issue." *Schuitmaker v. Krieger*, 2003 WL 1950238, *7 (Mich. App. 2003) (citing *Doe v. Mills*, 212 Mich. App. 73, 92 (1995)).

Defendants' conduct, taken individually or as a whole, simply does not rise to the level of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible grounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community ...." *Chisolm*, 218 F. Supp. 2d at 875 (quoting *Margita*, 159 Mich. App. at 188) (ellipse in original).

Moreover, the case Plaintiff principally relies upon as an example of "extreme and outrageous" behavior does not assist his argument because the *Haverbush* Court found that

> a rational trier of fact could find that [the defendant's] conduct was so outrageous in character and so extreme in degree that it went beyond all bounds of common decency in a civilized society. [The defendant] engaged in an escalating series of acts over a two-year period in which she: (1) sent a barrage of letters to Haverbush, to his daughter, and to his future in-laws, in which she called him a compulsive liar, threatened his fiancé with physical harm, and threatened to tell his colleagues that he had harassed [the defendant]; (2) left lingerie on Haverbush's vehicles and at his residence several times; (3) left an ax and a hatchet on his vehicles, after having asked him how his fiancee would like to have an ax through her windshield; (4) told a co-worker several times that someone should "ice" Haverbush; and (5)

[8]Plaintiff additionally cites *Johnson v. Wayne County*, 213 Mich. App. 143 (1995), and *Wilson v. Kiss*, 751 F. Supp. 1249 (E.D. Mich. 1990).

> wrote several letters threatening to move in with him even though he was engaged and would soon be married.

217 Mich. App. at 234-35.

Certainly the actions by Defendants in this case do not begin to approach the level of those in *Haverbush*. Moreover, assuming that Defendants did call Plaintiff the "maggot of mayhem", Pl. 2d Compl. at ¶ 76(f), or a "liar," *id.* at ¶ 76(a), that does not create a factual question because those comments merely constitute "'insults, indignities, threats, annoyances, petty oppressions, or other trivialities'"–all of which are not actionable under an IIED claim. *Chisolm*, 218 F. Supp. 2d at 875 (quoting *Margita*, 159 Mich. App. at 188) (internal quotations and ellipse in original).

Because Defendants' conduct is neither "extreme" nor "outrageous," Plaintiff cannot establish the first element of his IIED, and as such, summary judgment in Defendants favor on this claim is appropriate.

***E. Claim for Continuing Acts of Defamation/Retaliation***

Local Defendants assert that Plaintiff's claim for continuing acts of defamation/retaliation cannot be sustained because there is no evidence that Mitchell wrote or distributed posters/fliers which cast Plaintiff in a negative light. Moreover, Local 51 contends that there is no evidence that Bianchi, Stokes and Yokich removed Plaintiff from Local 51 bylaws committee. Finally, Local Defendants contend that there is no evidence that Plaintiff was denied the opportunity to review either membership minutes from November 2002 through February 2003 or lost time vouchers for Bianchi, Martin, Waingrow, Grant and Williams.

The International Union also argues that International Union Defendants are not

individually liable for continuing defamation/retaliation. Specifically, it is asserted that there is no factual basis for Plaintiff's claims that Stokes (1) disagreed with Plaintiff's views about lost time; (2) that the International Union has a policy against distributing copies of minutes of Local 51 meetings; (3) that Stokes' investigation of the 1998 challenged election and recommended that the election be overruled; and (4) that Stokes' determination that Plaintiff's internal appeals were untimely.

Moreover, International Union maintains that Maurice Mitchell cannot be held liable to Plaintiff because there is no factual basis upon which he can show that Maurice Mitchell was part of the International Union's policy to destroy him. Further, the International Union argues that Cutway is a party to this lawsuit solely because he referred to Plaintiff as a "liar." Even if this were true, argues International Union, it does not, by itself, establish a cognizable legal claim against Cutway.

International Union further argues that Geis is a party to this action because he decided that Plaintiff's 1998 charges of financial impropriety against Kirksey were unsubstantiated. Plaintiff contends that Geis' letter was written as part of a conspiracy launched by Local 51 and the International Union. Plaintiff, International Union maintains, has no proof for this claim.

International Union continues, arguing that Yokich cannot be held liable for Plaintiff's injuries given that Yokich participated in the decision to adhere to Stokes' recommendation and require a re-run election because he did so as a member of the IEB. Under Art. 33 of the UAW Constitution, the IEB renders decisions at the second level of the internal appeals process. Because Plaintiff did not specifically claim that Yokich inappropriately refused to uphold appeals against Plaintiff's political opponents, he should not be held liable for the

IEB's action.

International Union further argues that Gooden is not liable for Plaintiff's injuries. According to Plaintiff, the letter Gooden received from Geis indicating that his investigation had exonerated Kirksey, and a letter he later sent instructing Plaintiff's political ally John Williams that he could not simultaneously serve as Chief Steward and President of the Local 51, combined with the proratification leaftlet (featuring his picture on it), provide proof of Gooden's role in a Local 51-International Union conspiracy against Plaintiff. International Union argues that no violation or claim is shown by these facts.

Finally, International Union asserts that Plaintiff has not brought forth sufficient facts to support a claim against Wojcik. Plaintiff alleges that Wojcik told members that they should not associate themselves with Plaintiff and that Wojcik was going to "gut" Plaintiff and his political associates. Plaintiff further alleges that Wojcik undermined Plaintiff as a Committeeman when he overturned a grievance settlement and thwarted his efforts to address a perceived contract violation involving skilled trades work.

By Order of this Court, Plaintiff was permitted to submit a Second Amended Complaint whereby he added a continuing acts of defamation/retaliation claim. In it, he alleged several instances of such acts, each of which took place in 2002 and 2003. Pl. 2d Amend. Compl. at ¶¶ 105-130.

The Court finds that Defendants have met their burden by pointing out to the Court that Plaintiff, having had sufficient opportunity for discovery, has no evidence to support an his claim for continuing acts of defamation/retaliation. *See Tolton*, 48 F.3d 937; *Street*, 886 F.2d 1472.

Because Defendants have met their burden, Plaintiff cannot rest on its pleadings,

but must present significant probative evidence in support of his complaint. *Copeland*, 57 F.3d at 479. As to his claim for continuing acts of retaliation/defamation, Plaintiff offers only the meager following: "Plaintiff has by affidavit produced evidence of defendants' continuing acts." Pl. Br. at 31.

Presumably, Plaintiff is alluding to his own affidavit. Pl. Exh. 2, Pl. Aff. However, even a cursory reading of the affidavit reveals that only one paragraph of the affidavit makes any reference to a continuing act of retaliation/defamation in either 2002 or 2003. Pl. Exh. 2, Pl. Aff., ¶ 13. Accordingly, this is the only claim that the Court will consider given that Plaintiff bears the burden of presenting significant probative evidence which would create a question for the jury.

Plaintiff alleged that throughout all relevant periods, he was the elected chairman of the Local 51 bylaws committee, Pl. 2d Amend. Compl. at ¶ 106, and that he was wrongly removed from that position by Bianchi, Stokes and Yokich in September 2002. *Id.* at ¶ 113. Local 51argues that "Bianchi did not hold a union position in September 2002 and, therefore, had no ability to remove Plaintiff from" the committee. Local 51 Br. at 19. Moreover, Local 51 informs the Court that Yokich passed away in August 2002 and, thus, "likely had no ability to remove Plaintiff from the" committee. *Id.*

In his affidavit, Plaintiff swore: "I was unaware that the bylaws committee of which I was chairman in 2000 had been dissolved by the Local and International defendants and that I had been removed as chairman until discovery in this case in 2003." Pl. Exh. 2, Pl. Aff., ¶ 13 (brackets added). Clearly, Plaintiff has presented nothing beyond the fact that a committee he had chaired was dissolved. He fails to bring forth any evidence that either Bianchi, Stokes or Yokich were involved in the decision or that the decision to dissolve was

improper in his motion papers.

Accordingly, Plaintiff's claim for continuing acts of defamation/retaliation cannot be sustained and Defendants are entitled to summary judgment.

## V. CONCLUSION

For the reasons stated above, the Court GRANTS summary judgment in favor of Defendants on all of Plaintiff claims.

**IT IS SO ORDERED.**

Victoria A. Roberts
United States District Judge

Dated: NOV 04 2003